o

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., | § | |
| Plaintiff, | § § | |
| v. | § § | |
|  | § | Civil Action No. L-13-57 |
| AUDREY RICHEY BECK, INDIVIDUALLY AND D/B/A DOUBLE A'S | § § § | |
|  | § § | |
| Defendant. | § | |

## MEMORANDUM

Pending before the Court is Plaintiff J&J Sports, Inc.'s ("J&J") Motion for Default Judgment. (Dkt. 4.) For the reasons that follow, that motion will be GRANTED.

## BACKGROUND

J&J "is in the business of marketing and licensing commercial exhibitions of pay-per-view prizefight events," and "possessed the proprietary rights to exhibit and sublicense the right to exhibit" the March 12, 2011 closed-circuit telecast of "'Relentless:' Cotto/Mayorga Fight Program" (hereinafter "the Event"). (Dkt. 4 at 1-3.) J&J "was licensed to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas." (Dkt. 4 at 3.) A commercial establishment in Texas could legally show the Event only by

paying J&J a sublicensing fee based on the establishment's capacity. (Id.) J&J provided sublicensed establishments with "the electronic decoding equipment and satellite coordinates necessary to receive the signal or the establishment's cable or satellite provider would be notified to unscramble the reception." (Id.)

Defendant Audrey Richey Beck was the owner of Double A's, located at 905 N. 14th Street, Kingsville, TX 78363. (Dkt. 1 at 1.) On March 12, 2011, an investigator hired by J&J observed Double A's displaying the Event to 20 to 33 patrons using one projector, three 42-inch televisions, and two 27-inch televisions. (Dkt. 4-1, Ex. A-2.) Beck had neither contracted with J&J nor paid the required licensing fee. Rather, she unlawfully intercepted the broadcast of the Event. (Dkt. 4-1, Ex. A at ¶9.)

J&J filed its complaint on April 1, 2013, claiming that Beck's actions violated the Federal Communications Act of 1934, as amended, 47 U.S.C. §§ 553 and 605. (Dkt. 1.) Beck was served with process on May 3, 2013. (Dkt. 3.) When Beck neither answered nor otherwise defended as required by Fed. R. Civ. P. 12, J&J simultaneously filed a Request for Entry of Default (Dkt. 5) and a Motion for Default Judgment (Dkt. 4). The Clerk entered Beck's default, pursuant to Fed. R. Civ. P. 55(a), on August 19, 2013. (Dkt. 6.) J&J's Motion for Default

2

Judgment seeks recovery pursuant to 47 U.S.C. § 605 alone. (See Dkt. 4 at 19-20.)

## DISCUSSION

By defaulting, a defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." Nishimatsu Const. Co., Ltd. V. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). However, a defendant's default "does not in itself warrant . . . entering a default judgment." Id. Rather, "[t]here must be a sufficient basis in the pleadings for the judgment entered." Id. Further, damages must be proven through "a hearing or a demonstration by detailed affidavits establishing the necessary facts." United Artists Corp. v. Freeman, 605 F.2d 854, 857 (5th Cir. 1979) (per curiam).

### I. Beck's Liability

An individual violates the Communications Act ("the Act") by "intercept[ing] any radio communication . . . or receiv[ing] or assist[ing] in receiving any interstate or foreign communication by radio . . . for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). The pleadings establish that the Event's broadcast originated via satellite (i.e., a radio signal), and that Beck intercepted or received the broadcast without authorization and for her

3

business's benefit. (See Dkt. 1 at 3-4.) Accordingly, she is liable under the Act.

## II. Damages

The "party aggrieved" by a violation of § 605 may elect to recover either actual damages or statutory damages in a sum not less than $1,000 or more than $10,000. 47 U.S.C. § 605(e)(3)(C)(i). That is, the base statutory damages must range between $1,000 and $10,000. If the violation was committed "willfully and for purposes of direct or indirect financial advantage or private financial gain, the court in its discretion may increase the award of damages . . by an amount of not more than $100,000 . . . ." Id. § 605(e)(3)(C)(ii). In certain circumstances, then, a party may be entitled to $100,000 in additional statutory damages, over and above the actual damages or base statutory damages. The aggrieved party shall also recover reasonable attorneys' fees. Id. § 605(e)(3)(B)(iii).

J&J has opted to recover statutory rather than actual damages. It asks for base statutory damages of $10,000, the maximum amount available. To support its damages claims, J&J submits an affidavit of Thomas P. Riley, an attorney hired by J&J to deal with infringement claims. (Dkt. 4-1, Ex. A at ¶¶2-3.) He avers that losses suffered by J&J include lost licensing

fees and lost good will from establishments that paid licensing fees. (Dkt. 4-1, Ex. A at ¶¶12-14.) Further,

> [t]he continued viability of [J&J] as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event. If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming.

(Dkt. 4-1, Ex. A at ¶15.) Moreover, to adequately deter piracy, the cost of piracy must be significantly higher than the cost of buying a license. Entm't by J & J, Inc. v. Al-Waha Enterprises, Inc., 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002); (Dkt. 4-1, Ex. A at ¶17). Here, the licensing fee would have been between $1,200 and $1,600.[1] In these circumstances, the Court will award $5,000 in base statutory damages. See Al-Waha, 219 F. Supp. 2d at 776 (awarding $5,000 in base statutory damages where licensing fee would have been $1,500).

J&J also seeks $50,000 in additional statutory damages, claiming that Beck's interception of the Event's broadcast was willful and undertaken for the purpose of direct or indirect

---

[1] The J&J investigator predicted that Double A's maximum occupancy was approximately 120 people. (Dkt. 4-1, Ex. A-2.) For establishments with maximum occupancies of up to 100 people, the licensing fee was $1,200; for maximum occupancies of 101 to 200 people, the fee was $1,600. (Dkt. 4-1, Ex. A-3.) Accordingly, the licensing fee for Double A's would have been between $1,200 and $1,600.

5

commercial advantage or private financial gain. (Dkt. 4 at 14-18.) J&J argues that one does not "innocently" or accidentally intercept a scrambled broadcast; instead, it must be done intentionally. (Dkt. 4 at 14-15.) That is, to intercept a scrambled broadcast such as the broadcast of the Event,

> there must be some wrongful action, such as using an unauthorized decoder or satellite access card, obtaining cable or satellite service and illegally altering the cable or satellite service to bring the signal of the Event into the establishment, or moving an authorized decoder or satellite card from its authorized location to the commercial establishment.

(Dkt. 4-1, Ex. A at ¶10.) J&J does not allege the use of any particular descrambling technique, and it does not offer direct evidence of willfulness. However,

> [b]ased on the limited methods of intercepting closed circuit broadcasting of pay-per-view events and the low probability that a commercial establishment could intercept such a broadcast merely by chance . . ., courts have held conduct such as that of [the defendant] in this case to be willful and for the purposes of direct or indirect commercial advantage or private financial gain.

Al-Waha, 219 F.Supp.2d at 776. Accordingly, the Court finds that Beck's actions were willful.

Further, Beck acted for direct or indirect commercial advantage or private financial gain. Though Beck apparently did not impose a cover charge for viewing the Event, Beck's "patrons purchased food and/or drinks while viewing the Event." (Dkt. 4-1, Ex. A ¶11.) Further, it is obvious that commercial

establishments show sports programs to draw business, not out of charity.

J&J asks for the award of additional statutory damages of $50,000 for Beck's willful interception for financial gain. However, Beck did not impose a cover charge, only about 30 patrons viewed the Event, and J&J does not allege that Beck is a repeat offender. Therefore, the Court will only award total damages of $15,000, or three times the base award amount. See 47 U.S.C. § 605(e)(3)(C)(iii) (award of additional damages is at the Court's discretion); see also Al-Waha, 219 F.Supp.2d at 776 (awarding treble damages in similar case where violation was willful and for financial advantage).

J&J additionally seeks an award of attorneys' fees. As support of its requested fees, it submits an affidavit from one of its attorneys. (Dkt. 4-1, Ex. B.) J&J seeks fees in the amount of "one third of the actual and additional damages awarded to [J&J] . . . ." (Dkt. 4 at 19.) In the alternative, J&J seeks an award of $1,000 based on an hourly rate of $250 and four hours of work. (Id.; Dkt. 4-1, Ex. B at ¶¶2, 8-9.) The Court finds that the latter figure is reasonable and accordingly awards J&J attorneys' fees in the sum of $1,000.

J&J also seeks additional attorneys' fees based on certain post-judgment contingencies. (Dkt. 4 at 20.) For example, J&J seeks $15,000 "in the event a defendant files an appeal to the

7

Fifth Circuit Court of Appeals that does not result in a reversal of the Judgment obtained in this action . . . ." (Dkt. 4-1, Ex. B at ¶10.) To support its request for contingent post-judgment attorneys' fees, the affidavit of J&J's attorney merely states that "[i]t is . . . my opinion that the following attorneys' fees are reasonable . . . ." (Id. at ¶10.) Considering this extremely sparse evidence about the reasonableness of the post-judgment attorneys' fees, the Court declines to award such fees.

Finally, J&J requests "[a] permanent injunction that enjoins [Beck] from ever intercepting or exhibiting an unauthorized program in violation of the Federal Communications Act." (Dkt. 4 at 20.) Such an injunction would essentially enjoin Beck from violating the law, which of course is already her obligation. J&J does not explain why it needs or wants this injunction. The request for injunction is denied.

DONE at Laredo, Texas, this 9th day of October, 2013.

_____
George P. Kazen
Senior United States District Judge